Please call the next case. Number 16, 10-54. Mr. Simeca, you're up. You're up. You're up. Please report. Counsel. Mark McTrynder from Bryant. Village of Hebron. I would like to say that the decision, the compensation commission in this case, does not match up with what the discussion was about the commission decision in the previous matter. Here, I believe the commission laid out the evidence, laid out its specific findings as to why they were denying further benefits, and they made the decision they made. It appears to be an argument that there is one more fact that matters, namely an MRI done in 2012, but the commission didn't ignore that. They didn't ignore that. They ignored a part of it. It seems to be a substantial issue. In what sense, Your Honor? Well, I agree with you. The commission found the MRI, that there was a minimal peripheral enhancing granulation tissue which caused mass effect on the interior left paracentral portion of the fecal sac and hinges on the butt, which you will inform me of. The commission had the first part correct. Within the context of this whole thing, the report goes on to say, this is associated with a recurrent or persistent diffuse broad-based disc protrusion, although there is more pronounced left paracentral. Okay? The report says, goes on to say, described the protrusion as causing mass effect, mass effect on the fecal sac and impingement on the left intervertebral foramina. Okay? They ignored that. Also, Dr. Sitow, who was the treating physician, reviewed the report and further recommended treatment based on its context. So why did they find that there was no problem when you had this second part of the report that they clearly ignored? Mass effect means nothing? At least two points, Your Honor. There may be a third there. But one, the commission didn't ignore it. They recited the findings. Yes. But the portion of those findings that they sought to give greater weight to was the minimal part and not the mass effect part. Well, how do you ignore the mass effect part? Isn't that part of the report? Well, they didn't ignore it. They weighed the evidence and they gave more weight to that part of the report. Well, the minimal part, they gave little weight to the mass part. Well, but mass effect is not the same as massive effect. There wasn't a massive effect. There was a difference. Mass effect, in this terminology, having done this for a few years now, that just means that generally there was the fecal sac was impressive. The fecal sac is the portion that surrounds the nerve root. The fecal sac could be touching. The nerve may not. There are always some unanswered questions here, just like there was an unanswered question in the last case. What was actually found during the surgery? Who knows? But we know something here. We know that the commission looked at all the evidence. It isn't just one piece of evidence. And I'll grant you the statement you made. Obviously, I'm more aware of that than the commission. We referenced to it along with other things. And that's the second part of what I was going to answer, and that is – Well, before you go on to the second part, staying with this MRI report and the language that was quoted, what medical evidence, including any physician opinion testimony, equated what was read from the MRI report here just moments ago to the commission's subsequent sentence, which is considering the minimal effect of the disc protrusion on petitioner's condition per the MRI. What medical evidence supports that statement? What equates the quoted language from the MRI report with minimal effect of the disc protrusion on petitioner's condition? Or is that strictly the commission's interpretation? Well, I think it's the commission's finding or conclusion, what have you. Interpretation. Well, in our conclusion, is there anything supporting that? Not in the strict sense of a doctor's opinion, like Dr. Salih or Dr. Poirot, no. So in order to lend credence to that finding, we would have to make the determination that the commission is qualified to make that finding, that it is capable of interpreting the MRI report, the language that was read, to mean that it constituted evidence of minimal effect of the disc protrusion on petitioner's condition. Is that correct? If I understand your question correctly, it does. But to answer, I think I'm answering the question that you're posing, how did the commission come to this? They are qualified to do that. You're arguing against your own position here. You understand that. No. Your Honor, perhaps you misapprehend. The commission could make the determination that that MRI showed that there was minimal effect. So you're acknowledging that the commission is qualified to interpret the MRI report in the manner that it did? Well, again, in conjunction with all the other evidence, there's other evidence. This isn't the scene of Huanan here. Well, let's talk about the other evidence. Obviously, the commission relied on Salahi and Pleyer reaching a conclusion, correct? End of the year, yes, sir. Right. Did Salahi and Pleyer ever review the MRI? Apparently, they did not. Okay. Both cited the, quote-unquote, lack of objective findings as the basis for their opinion. So they said there's a lack of objective findings. They wanted to look at the MRI. Isn't that a problem? Yes and no. It would be, you know, as they say in Spanish, ojalá que sí, you know, if only. I certainly would have liked to have seen that. I didn't try the case. Unfortunately, it's always good to look back and, you know, now all of a sudden you're on mission. However, that may be. Also, Citro, just for the record, Citro informally, in his opinion, acknowledged he did review the MRI report in his opinion. Right. But he didn't see the video. He didn't see the man limping before the video and not limping during the video. Well, he saw the MRI. That's really the issue here. And the Commission's interpretation of the issue is obviously key here, and he did review it. Well, he did. Great. But I don't think that that, again, I don't think that's the, you know, again, to refer to that. That's not the smoking gun. Far from picking up our opposing counsel, that's not the smoking gun. Well, if I could proceed with what I'm now, I'd like to keep my remarks on a higher level. Back on the kind of time-honored principle, if there's anything in the record that will support the Commission's decision, it's not against math. That's the way we have it. Absolutely not. Critically. But there's lots of stuff in the record other than this MRI. This is for the three little pigs. Whoever gets the last piece of evidence in. What's that other stuff? It's only one piece of evidence. Now let's focus on that other stuff. Yes. What's the other stuff? Now, that's part two. I hope I stay focused on that. And that is, and again, I'd want to have a better record. Well, you have asked somebody to handle a player. What was the cause? What produced those findings in the MRI done in May 2012? Do we know? Do we really know? No, we don't. Could it have been that activity that we saw on the video? And could we infer from that type of activity that the Petitioner was doing other kinds of activities similar to that type of activity? This is a copy that's hit by a truck, meaning there was an accident, correct? I don't know. We paid for all of that. We didn't pay for the MRI. I mean, because, again, that's open medical. You can go get tests. Are you talking about him getting out of his pickup truck is a possible explanation? He was getting up. I don't know. I think there were jet skis there. He was picking up a trailer, et cetera. Jet skis didn't have any motor in them, so they didn't weigh much, right? That was his? Well, I don't know. For me, a jet ski with a roll-out motor, I've picked up 65 pounds of files before that hurt my back. I weighed myself after. That's a lot of weight for a thin person like myself. I don't know that I could pick up a jet ski without a motor and not hurt myself. Who's Mr. Draw? I'm sorry? Who's Mr. Draw, D-R-O-W-N-G, who's Draw in this case? Oh, gee. Is he a witness, Mr. Draw? He may have been the investigator. I'm sorry. I'm not going to be able to specifically. He viewed the video, which, by the way, I also understand. He basically says that he didn't jump down from the truck. Draw says that he alighted himself. He eased himself down from the truck. You look at the video, right? Ease? Lack of ease. I, I, the commission saw the video. Was he the videographer? Pardon? I'm sorry. Was he the videographer? I believe so. Yeah, he's the videographer. Right. The videographer. Right, but I mean, I don't think that this has all of a sudden become some huge admission. Both Drs. Pleyer and Salaitis saw the video, and it also took, I mean, repeat through their, their reports, as well as the arbitrator's decision. Exaggerated pain behaviors. Inappropriate behavior. That's the arbitrator. Dr. Pleyer, numerous pain visualizations. Inappropriate pain behavior. Nonphysical findings. Salaitis says significant discrepancies. He kneeled and squatted throughout the, and he cited other facets of the video. Which, to him, were significant discrepancies between what he saw and what, how petitions presented themselves. Inconsistent behavioral responses, et cetera, over reaction. So, the, the, the record is replete with references to, for lack of a better term, symptom magnification, as, as, as is said. And again, it is an unanswered question. I would have loved to have, have had it more perfectly answered. And that is Dr. Salaitis, Dr. Pleyer, has asked. Was it an opinion only as good as the underlying basis for it? It, it, it, oh, that's correct. We cite some of you. So, if you want to have a say in your argument in this case, you can get opinions of two experts that said, the claimant's case fails for lack of proof because there's no objective findings at all to support the claim. And yet there's this MRI that does. Doesn't that render their opinions problematic? Well, you know, the right objective, if you look back a little bit across the street, anything's possible. I mean, it hasn't been traditionally possible to do. Oh, I realize that. I know that. And just as an aside, I've stood before this court many times with commission decisions that are woefully lacking. And I've asked myself, what am I doing here? I run this case fair and square. And all I'm doing is trying to support the decision that should have, they should have let me write it. So be it. I'm sure almost every lawyer who I was before you could say something very, very similar. Legal writing malpractice sometimes. Even as a name. This record has lots of evidence that shows that petitioner's not unreliable. Now, I understand he's a police officer. I have police officers in my family. Don't like getting up here and making arguments against first responders. No, no, it's not fun. But the evidence that the commission reviewed and the decision they made was not inconsistent with the evidence. It was not against the manifest weight of the evidence. We really don't know what the cause of the MRI gun so many months later was. I agree. It would be very, very good if Dr. Szilagyi and Dr. Plater both looked at it and said, well, there's really not much going on here. And in the meantime, it could have been a cause that was confusing. This is not your average case. Because the crux of the commission's finding deals with their interpretation of the MRI. In most cases, you're going to say, well, it's a battle of the experts. Where the experts say, we're making this finding upon a lack of objective evidence. When you have an MRI that provides the objective evidence, they haven't even been viewed. Doesn't that take the problem to a little different level? Not necessarily. It depends on the case. I would have to say, in this case, specifically, we have these doctors who see this man behaving in a fashion that's inconsistent with what he says. The findings may be, whatever the findings are, may be there. They're legitimate. These are pictures of the man's lumbar spine. Are they causing disability? Are they causing pain? We think they look at it. They find wrong. And the surveillance video we have is wrong. Therefore, that's the problem. It doesn't matter what we have. We don't need to even look at it because it's irrelevant. Well, there's more to it than just jumping off the truck. I do not deign to just stand here and read to the court what the commission found. They made specific findings about what was in the video and what was in the MRI. And as far as the MRI being the crux, I would have to disagree with that. I don't know that it's the crux again. I'm going to interrupt you. I also want to apologize because I mischaracterized my questions of you previously as softball-type questions. I conveniently overlooked the fact that the circuit court reversed the commission. You are defending the commission's decision here. So going back to my initial questions in regards to the commission's interpretation of the MRI report, they certainly made that determination without the aid of any physician testimony in order to support that characterization. They basically were falling back on what has been the deference given to the commission that it possesses this medical expertise and they're able to make such determinations. Fair? No apology necessary, Your Honor. My feeling is that the commission does have the authority, the power, and the ability. I mean, this court itself has cited many times that this is something at which the commission has expertise. They looked at the MRI and made a determination in conjunction with the other evidence. How far can we extend that deference, what many would consider to be a fiction, that the commission has this medical expertise? To me, the quoted language from the MRI report is very technical medical terminology, and the commission interpreted it in a way to serve, I would suggest, as the primary basis for its decision in this case. And there is no medical testimony supporting its interpretation. That's somewhat troubling, I think. Well, I can understand your concern, but it is a deal. That was not the only reason. The commission cited three things. They cited the neural effect. What they found to be evidence of symptom magnification as well as the surveillance video. Correct. So it was a tripartite reasoning. So let's just put aside its interpretation of the MRI report. Are you indicating that the evidence of symptom magnification as well as the video surveillance evidence is sufficient to support the commission's decision in this case? Well, absolutely and unequivocally. But if I could deal with the larger question that you asked about, does the commission have, do they really have this expertise, and how are we to deal with more complex, I don't know if this case is one of those, but more complex medical legal issues, I hark back to that old Dean case, Dean v. Industrial Commission, wherein the court held that if there was only one doctor who was testifying to a causal connection, this was, I believe, a heart attack case, that since there was no other evidence, the commission was compelled as a matter of law to find how that doctor thought. And that case was for a claimant, I believe. Yours truly appeared before this court in Sorensen v. Industrial Commission, where we were the appellant, we didn't get the award we wanted, and there was only one doctor, our examining physician, who found the causal connection in a need for surgery, which the commission had denied. No other medical evidence. We had an expert. This court declined to follow Dean and affirmed the commission in Mr. Sorensen's case. And since then, I don't think Dean's been followed. Sorensen gets cited all the time. In fact, I think within the last six months or so, I've been before the court in two or three of the briefs, Sorensen gets cited. Sorensen's wrong. So that stays with the proposition that the commission, well, in my opinion, and Sorensen could get it wrong. But the deal, the nexus between Dean and Sorensen is such that the commission doesn't have to listen to one doctor. Now, unfortunately, we did not cite these cases. But you asked a large question about what, in fact, is the expertise of the commission. And, I mean, that's something that you get a good look at. The commission can listen to medical testimony and reject an opinion misproffered for any number of reasons. But here we're not talking about that. We're talking about the commission taking a piece of medical evidence, an MRI report, and providing its own impression, attaching that to that particular piece of medical evidence, that being the MRI report. And you're saying it's qualified to do that? Yes. And just for the record here, the commission recited the entire finding. They didn't leave out the part about mass effect. But if I reiterate, mass effect is not the same as massive effect. They put in the entire finding because it neglected to put in their evidence of the impingement on the exiting nerve group. Well, on page A11 of our appendix, that is recited. The A11? Yeah, A11. Impinges on the left intervertebral foramen. Causes mass effect on the anterior left paracentral portion of the fecal sac. Again, the fecal sac is the lining. It's, you know, the sac. Final question. Did the commission ever specifically find that the claimant was fabricating his symptoms? Did they find that? Or did they say he was manic? They didn't do that. You know, in my mind, they were being kind, but so be it. That's a very simple logic. To magnify the guilty of magnifying a symptom, you must have a symptom to begin with, right? Oh, I don't know if I would go along with that. I'll take a look at that. Counsel, you may respond. Good morning, ladies and gentlemen. This is on behalf of Officer Sheminka. And while I'm not surprised, I will commend the justices for picking up on exactly the crux of this matter. And going backward to Justice Harris's point and saying, well, there may have been three bases. One was the video, one was the symptom verification, and then there's this question of the video or the MRI. Look, the video was exaggerated by them, right? Dr. Salehi, in his report, specifically says that he jumped off. You can read it in the record, right? He jumps off the truck. That's contradicted by the investigator himself. When I cross-examined him and I asked him, did he jump? No. He had to sit on the edge and ease himself up. So just on the video alone, Salehi is suspect. Right there. On the issue of symptom magnification, you are correct. Something needs to be there in order to be magnified. Now, what do we know? We know that on August 31, Officer Sheminka is at the doctor's office saying, I'm not right. I still have that numbness in my left foot, in my left leg. Doctor says, well, you're only eight weeks out from surgery. Right? He had surgery in June. In August, he's like, I'm still getting numbness. Something's not right. So SIT-TEL says on August 31, we should get a new MRI. That's SIT-TEL for authorization. And what do they say? You know what they say? We're not interested in finding out what's wrong with you. We're not interested in finding out if there's any pathology. We're just going to have you video surveilled ten days later on September 10. And then have you go to a Section 12 evaluation three days after that with Dr. Salehi. So whatever is on the doctor's mind that's causing a problem existed before the MRI. So what we know is they never allow him to get the MRI. Salehi says there's nothing there. He's jumping off of trucks. And there's no logical basis to say that there's anything wrong with him. How does the commission rely on that? Well, it can't. Because when the MRI comes in and it has a finding, and Dr. SIT-TEL provides the only medical opinion in the record, and Justice Hudson, I think you pick up on this, which is when we have the commission interpreting one expert versus another, can the commission select one? Yes, but that's not what we have here. We have the commission saying we are going to make our medical interpretation as the medical evidence in the record above a fully-vetted, blood-certified neurosurgeon who places his opinion in the record. Okay. Let's, so we don't get off into tangents here, SIT-TEL looks at the MRI. Yes, sir. Okay. And renders a medical opinion. He does, sir.  I'm not sure whether we want to go down that road of saying that the commission can't look at medical evidence and interpret and infer and conclude from that. Are you trying to suggest otherwise? Well, I'm not saying the commission can't look at it. Well, yeah, well, obviously they look at it. What they do with it is where we're at. Yes, and my suggestion is, if you're trying to look at an MRI with very technical terms of enhancing scar tissue that's abutting the sac and impinging on the nerve room, we should have a medical opinion that describes that or interprets that. The commission is not a medical personnel. They are not board-certified physicians. Did any doctor testify that the quoted language within the commission's report relative to the MRI report had any significance to the claimant's condition? Well, a doctor sits out, reviews on May 25 the MRI on May 11th, and evaluates it, identifies exactly what's in the MRI. It's enhancing scar tissue. The question was, how do we know where it came from? Maybe he was out doing another activity. Look, he's got scar tissue from the surgery that was performed that everybody agrees was needed. That scar tissue came from that surgery. To answer Justice Harris's question, there wasn't another doctor with a contrary opinion because Player and Szilagyi admittedly never even looked at the MRI. They did not. They couldn't provide an interpretation of something they didn't look at. That's correct. So the commission has no basis to support their decision other than their own thought process, which I pass it to the court, is not on the same level as a board-certified neurosurgeon in the record. I think the respondents counseled here failed to do their job. They probably had an obligation to their client to have that MRI reviewed by their physician. Let me just draw a hypothetical. Let's say that there was no MRI report, but there was the MRI film that was part of the record. Would the commission be able to base its decision, in this case, upon its review of the MRI film and its interpretation of the MRI, where there was no medical testimony supporting the interpretation? Could it do that and base it simply on what has been stated by the Supreme Court that the commission has long recognized as having medical expertise? If I understand your question, it would mean that the May 25 Sitow report, which reviewed the MRI, was absent. No report. Okay. I'll skip that one. The answer is, I still think that's a stretch for the commission to diminish the MRI a bit. And I think it would depend, in your hypothetical, I think it would depend on what was in the MRI report. I think if there was kind of an equivocal, there's minimal. I'm saying there's no report. There's no medical evidence in the way of testimony interpreting the MRI film. All the commission gets is the scan itself, and it's looking at it, and it provides its own interpretation of that film. Can it do that? I don't think they can, Your Honor. I think the MRI. So those have been close by. Well, no, no, I think that the Supreme Court is correct to the extent that they have some medical expertise that they can review, but there also has to be a review of what the physician in the record says. We've got very clear hypothetical here. Remember, there's a piece of medical evidence. Let me explain it so we get there. Correct me if I'm wrong. There's a piece of medical evidence called MRI. There's no testimony by a physician as to that MRI whatsoever, but the commission looks at the MRI and concludes certain things and bases their decisions on that conclusion. Yes or no? If I could just say, are you counting the radiologist who read the MRI and produced the report as a physician? No, that was my question. Are you saying he's not in the report? Correct. Well, how do we even know what the MRI says, then, in that hypothetical? They look at it just like their radiologist would look at it. You mean they look at the films? That's the hypothetical. Yeah, he would be probably your audiologist. Okay. I have to be honest, Your Honors, I don't think that that is something that I have ever seen in nearly 25 years. No, it's a hypothetical. In that situation, I would say no. I do not believe the commission possesses it. They said there is an extent, limited upon the Supreme Court's findings that, or conclusion that they possess unique medical expertise. Yes, yes. I think that's probably as concisely as you can put it. They have some expertise, but it's limited. And there is a line that they cross. But in this case, we don't have to evaluate whether or not they cross the line because we have a medical opinion. Okay, so, again, you can't say just because you have a medical opinion either side and the other side doesn't, that that side with medical opinion prevails. We've never said that. You can have a contrary conclusion in the face of one medical opinion that one side has, as long as the other evidence is sufficient to support the conclusion of the commission. And the other evidence that we're trying to get to support are two pieces. One is that they said he's symptom-magnified, which the arbitrator said, who watched the petitioner testify, wasn't enough to overcome what was in the medical record. And Justice Caldwell uniquely said- Justice, you're elevating me. I think he would be honored. I apologize. But Judge Caldwell also said, he reviewed the video, there was nothing in the video that said he was capable of conducting himself as a police officer based upon the misinterpretation. What was on that video was almost innocuous. Yes, he gets in and out of a truck. He doesn't lift it. I mean, there was some indication that he lifted it. But if you watch it, all he did was kind of chug a little bit and it was empty. There was no motor in it. Had the video investigator taken that important 13 minutes, which was left out, he would have seen that that jet ski that came out of the water was towed by a rope because it had no motor in it. But he specifically left out portions of the video. Now, he says he was repositioning himself. I have taken that as word, but that's important to note. And where did they take it? To a shop. This was clearly going to be- How did they hook up the trailer? The trailer was already hooked up to the back of a vehicle. So there wasn't any lifting of the trailer? There was no lifting of the trailer in any way. The trailer was not moved in any way. It was already hooked to the back of a vehicle. It was hooked up to another person's truck. Another person's truck? Yes, sir. And what's the testimony about being lifted up? The jet skis were owned by another person. I'm just concerned about lifting up the trailer. There was no lifting of the trailer. There was no attaching of the trailer. That was not out of the surveillance. That was not indicated. The only lifting on the video was this idea that if you watch it, the jet ski is a little crooked on the back, and so it's kind of just pushed over to the side to fall into the rut. That's it. We've had it lifted. It's more like shoved. But, again, Seligy saying, in his report, he uses the word jumps off. It's just incorrect. It's there to exaggerate the video to support a position that had no basis. And then coupled with the fact that it doesn't take into account the findings on the MRI. I think that there is a standard within the commission on these cases. I have to produce a medical opinion to support my client's position, and we did. We got an MRI that had specific findings, very specific findings, of enhanced scar tissue from a surgery that nobody disputes, that's abutting and cutting off the exiting nerve which would clearly explain the complaints he had prior to the video. The doctor says so. There was nothing to contradict that. To say then that the commission is in a position to downplay the MRI and then ignore Dr. Sitow crosses the line that the Supreme Court has provided the commission with some medical expertise. What did Sitow actually say on May 25th of 2012? He reviewed the MRI. He says that the MRI has some the findings that are described and he reads them word for word and he indicates that the petitioner should undergo the epidural to see if that provides some relief and he was not at MMI and was still restricted. Did he indicate that he found an L5S1 herniation in the MRI? He basically read, if you read his note, it basically mimics word for word what's in the MRI. And just from the essence of what the MRI says itself has its own connection to where the scar tissue comes from. It's from the surgery. It's at the place that the surgery was performed. Now, in addition to that scar tissue, the MRI language itself, the radiologist who wrote the MRI report itself also says that there's either recurrent or persistent herniations. Now, that's a radiologist, a qualified, radiologically trained physician who put something in the record. Does the commission get to oversee, supersede him too? Now we're talking about the commission taking their medical understanding, replacing the board-certified radiologist, and then replacing... Did the radiologist say recurrent? What was that? In addition to what you're reading, he said that there was a recurrent or persistent disc protrusion impinging on the left exiting nerve root. That's word for word. How do you interpret those words, recurrent or persistent? Well, that there's a protrusion that exists. And it's either that it's still there from before, persistent, or that after the surgery, it has recurred. Maybe in the aggressive physical therapy that is noted at Columbia Physical Therapy in which you are going, four or five days. Yeah. So recurrent or persistent could mean that it continues to be there from before and wasn't properly repaired or completely repaired, or that it has come back out. But those are there. And you can't have a radiologist say so and then an officer didn't say so, and the commission, within its purview, say, well, we'll indict them. I think there was fine man obligation to have that stuff reviewed, and they didn't. And because they didn't, officers should have remained under treatment, needed treatment. He was not an MMI. I'd ask that you reinstate the other trigger and then affirm Judge Collivoy. Thank you. Any other questions? The other trigger, it says that May the 25th, Sitow reviewed the MRI of May the 18th and noted that it demonstrated a recurrent left-sided O5S1 herniation. Where did he say that? Where did you get that from? Yeah, where did he get that from? He would get that from Dr. Sitow's record. Remember, the MRI, the core of the MRI does not use the word herniation anywhere. If you take a look at the May 25 note, which I'm looking at now, it said I had the opportunity to review the MRI of patient Shemeika on May 12th demonstrating recurrent left-sided L5S1 herniation. I discussed the MRI with Mr. Shemeika and informed him of the findings... No, no, I understand. The question that I have is, from the radiologist's report, does he note an L5S1 herniation anywhere in the report? There's also a May 18 office note, which is post-MRI, and it says changes of the left-sided hemiluminectomy at L5S1 with enhancing granulation tissue within the luminectomy bed, as well as extending into the left aspect of the spinal canal at this level. This is associated with a recurrent or persistent diffuse blood-based protrusion. There is no pronounced left paracentral and foraminal protrusion, which is minimal. Peripherally enhancing granulation, which causes the mass effect on the anterior left paracentral portion of the left fecal sac and impinges on the left intervertebral foramina. That's a big piece of evidence. That's a big piece of interpretation. Let me ask you a question specifically to be fair. Sitka obviously has it in his notes that there's a disc herniation, but the radiologist didn't specifically make that point. Correct? The radiologist says that it appears it's either recurrent or persistent. The question of what it is, is it a herniation? I think the radiologist specifically opined it was. Now whether or not that occurs today in any other way is debatable, but that's his question. Yeah, I think the radiologist raises the specter and says there's something there you better take a closer look, at which point Sitka takes the initiative. He does not diagnose a herniation. Does not. Am I right, radiologist? Yes. No, I believe he's not. He doesn't generalize all of this as a herniation. Well, the NRA does say that. We know what that says, but we're talking about the radiologist. Did he actually characterize it precisely as a persistent herniation? We're talking about the radiologist's report. Does the radiologist's report of May 18, 2012 use the word herniation anywhere? It uses the word herniated. It used herniated to be a recurrent left paracentral and foraminal disc protrusion. So it uses the word disc protrusion. Yeah, that's all it does is use herniation. Yes, sir. Thanks. Okay, thank you, counsel. Counsel, you have a reply opportunity. Thank you. Not a long one, though, but you're happy. We always say that. Fair enough. All I can say about Dr. Setow is this. We had a lot of back and forth here, but I'm looking at the record, and Dr. Setow has this note from the 25th of May. I had the opportunity to review it, the MRI, demonstrating recurrent left-sided alpha S1 herniation. That's all. So there are no other notes where he reads out the MRI findings. I'm not a fan of the MRI. He does say that it's disc herniation. He says that's all he says. He says it's recurrent. Okay. That's all he says. The radiologist didn't say anything about it. Broad-based protrusion. As Justice Holdren said, you know, we get into this debate. Protrusions, herniations, bulges, et cetera, et cetera, et cetera. But I don't think that's the discussion for today here. The discussion for today here is did the commission diminish, because that's, counsel used that word, and that's in his brief too, the evidence from Dr. Setow. And their justification, he didn't?  I mean, they weighed the evidence, and they didn't give as much weight to Dr. Setow as they did to the other doctors. But there's no statement of causation there. I want to understand this. The commission, as to the man's condition, the commission gave greater weight to the doctor who never saw the MRI than you did to the doctor who did see the MRI. That make sense to you? In this case, it does, because Dr. Setow didn't see the video either. So he was? He did see the MRI. I don't know about the video. No, what I'm saying is that both sides were a little bit deficient in what they had and what they didn't have. That's all I'm saying. Now, Dr. Setow, if he had seen the video, he may have said, ah, nothing. He may have said, this is persistent post-surgical problem. No, he didn't say that. He called it recurrent. Let me blame you for your proceeding, because you know you have a problem when the experts on the commission side didn't review the evidence. So your response is very creative. If you said, well, on the other hand, Setow didn't see this thing about whether or not he jumped or eased off of the truck. Therefore, Citroen's opinion must be deficient too. Well, do a bit of a more collateral matter thing. I see the court dealing me with faint plays, but I'm not going to accept that necessarily. I'm not necessarily going to accept that, because it's just a bigger picture is all I'm saying. It's a recurrent discretion. What does that mean if that is correct and what it was versus a protrusion or a bulge? Again, that's not the topic of debate. What is the topic of debate is what is his condition? Is it a condition that's causally related and a disabling one, or isn't it? There's competing evidence. Oh, I would easily admit that, yeah, I would have liked the facts to be different. I mean, you know, again, that's the appellate lawyer gets to say, yeah, maybe we should have done this or should have done that. It would have been very nice to have Dr. Saleh and players say, we looked at the MRI. We don't think this means much because it's minimal. You know, again, mass effect, if you had a doctor explain what mass effect means, you would not be as impressed with that term, mass effect, as you appear to be. I've done this long enough to know mass effect. It's general. If you have a swollen ear, it may have an effect on the muscle. It's a mass effect. It may not specifically mean a whole lot, but there was minimal. Forget all the exact findings now. So the commission is permitted to look at it. And by the way, I don't know, I agree with counsel on this, I don't know if the commission could make a decision by looking at MRI films. I mean, I've been doing this a long time, but, you know, the doctor had to tell me if that was a boy or a girl on the ultrasound when, you know, my wife was pregnant with children, and I suppose all of us can feel the same way. I don't know if the expertise extends that far unless, of course, we have arbitrators and commissioners who are physicians as well. But, no, that's a difficult thing to do, to find for somebody based on what we saw on an MRI. If they were to say we looked at the MRI films themselves and we don't know what the heck they say, therefore we can't say anything about it, well, that, of course, would be fine. But the long and the short of it here is that there is a manifestly standard. There is evidence in the record sufficient to support the findings. Of course, the MRI and Dr. Sitow's one-line statement are not the be-all and end-all. There's other evidence. And, of course, there is no issue over the accident itself or the surgery that Mr. Skonecka had. I mean, his case isn't over in that sense. He probably can look forward to it more. This is not something where the cash payers in the village of Hebrew are trying to run away from Mr. Skonecka's case. But I think this evidence in the form of Dr. Sitow's statement, I mean, that's not exactly bowling me over. Thank you, counsel. Thank you both, counsel, for your arguments on this matter. We'll be taking an advisement. This position is now issued. The clerk will take a brief recess.